**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**GEOFFREY H. ANDERSON,**

      **Plaintiff,**

**vs.**                            **Case No. 4:08cv549-RH/WCS**

**DIANE JAMES,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

Defendant filed a motion for summary judgment on March 8, 2010. Doc. 45.

Plaintiff, who is proceeding *pro se* in this civil rights action, was advised of his obligation

to respond to the summary judgment under Rule 56. Doc. 48. Plaintiff requested an

opportunity to conduct discovery prior to responding, which was granted. Docs. 51, 53.

Plaintiff has filed a statement of material facts, doc. 66, and his opposition to summary

judgment, doc. 67. Defendant's motion for summary judgment is ready for a ruling.[1]

_____

[1] Defendant also filed a document providing clarification of the judgment entered
in Plaintiff's criminal trial, doc. 65, but that document was "to be considered in
conjunction with Plaintiff's assertion in . . . response to Defendant James' response to
Motion to Compel" and is not being considered Rule 56 evidence. Plaintiff's response to
that document, a notice of "information and juror's note," doc. 68, will also not be
considered in ruling on the motion for summary judgment. Moreover, the documents

**Plaintiff's Fifth Amended Complaint, doc. 23**

Plaintiff alleges that while he was involuntarily committed to the Florida State

Hospital for mental capacity evaluation pending a criminal charge, his due process

rights were violated when he was attacked twice by other patients at the Hospital.

Plaintiff contends staff and administration were aware of the dangerous conditions that

exist at the Hospital, but were deliberately indifferent to those conditions as a matter of

policy.  Plaintiff claims the Defendant failed to protect him from harm and exposed him

to a substantial risk of serious harm.  Plaintiff seeks compensatory and punitive

damages from the Defendant in her individual capacity.[2]  Plaintiff brings his claims

under 42 U.S.C. § 1983, § 1985, and § 1986.  Doc. 23.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment, the Defendant initially has the burden to

demonstrate an absence of evidence to support the nonmoving party's case.  Celotex

Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d

265 (1986).  If accomplished, the burden then shifts to Plaintiff to come forward with

evidentiary material demonstrating a genuine issue of material fact for trial.  Id.  An

issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v.

Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).

Plaintiff must show more than the existence of a "metaphysical doubt" regarding the

───────────────

concerning Plaintiff's criminal conviction occurred after the relevant dates in this case.
Plaintiff's conviction was not until September 21, 2007.  Doc. 65-1.  Plaintiff was
released from the Florida State Hospital in June of 2007.  See doc. 45-1, p. 5.

[2] Plaintiff has withdrawn his constitutional claims against Defendant in her official
capacity, recognizing the Eleventh Amendment immunity defense.  Doc. 67, p. 23.

material facts, <u>Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Hickson Corp.</u>, 357 F.3d at 1260, *quoting* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, <u>Watkins v. Ford Motor Co.</u>, 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts.  <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* <u>Ricci v. DeStefano</u>, 129 S.Ct. 2658, 2677 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co.,</u> 475 U.S. at 587 (internal quotation marks omitted), *quoted in* <u>Ricci v. DeStefano</u>, 129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

**The relevant Rule 56(e) evidence**

**Defendant's evidence**

Plaintiff's claim concerns the period following Plaintiff's admission as a "forensic resident" to the Florida State Hospital on January 8, 2007.  Doc. 45, pp. 1-2. The Defendant in this case is the Hospital Administrator for the Florida Sate Hospital (FSH), Diane R. James.  Doc. 45-1, p. 2 (sworn declaration of Diane R. James, referred to hereinafter as "James affidavit"); (Doc. 45, Ex. 1).[3]

FSH is an in-patient residential facility for mental health evaluation and treatment located in Chattahoochee, Florida.  Doc. 45-1, p. 2 (doc. 45, Ex. 1).  The Hospital "houses both forensic residents, such as Plaintiff, who are admitted from the corrections or criminal justice systems and civilly committed residents."  Doc. 45-1, p. 2 (doc. 45, Ex. 1).  On its 620 acres, the Hospital has 11 separate residential units, four of which are "designated as secure forensic units, and seven are designated as civil units."  Doc. 45-1, pp. 2-3 (doc. 45, Ex. 1).  Even though a unit may be designated as a "civil unit, each unit on the Florida State Hospital campus houses some forensic commitments who are in various stages of progression toward the goal of competency or mental stabilization."  Doc. 45-1, p. 3 (doc. 45, Ex. 1).

Defendant states that she has no personal knowledge of the January, 2007, attack Plaintiff alleges he suffered.  Doc. 45-1, p. 3 (doc. 45, Ex. 1).  Defendant avers that Plaintiff did not complain to her about witnessing several attacks by patients within

_____

[3] All references to exhibits are to those attached to document 45, unless otherwise noted.  References are first to the document and page number assigned in the electronic docket, followed by a reference (in parenthesis) to the corresponding document exhibit.  Both citations are referenced as a pro se litigant will not have access to the court's electronic docket.

days of his admission, on January 9, 2007. *Id.* She further states she "was never contacted by Plaintiff concerning this incident" and has no knowledge of Plaintiff's effort to contact the police. *Id.*

Defendant avers that she has no personal knowledge of matters contained in the Police Report prepared by Officer Chason on or about January 19, 2007, but did review that report in preparation for this case. Doc. 45-1, p. 3 (doc. 45, Ex. 1). Defendant points out that the report concluded that FSH staff handled the incident correctly and concluded that no further action was necessary. Doc. 45-1, pp. 3-4 (doc. 45, Ex. 1).

Defendant states that she has no personal knowledge about Plaintiff contacting Adult Protective Services points out that this state agency is not a part of Florida State Hospital and has no obligation to report to the Defendant complaints they might receive. Doc. 45-1, p. 4 (doc. 45, Ex. 1). Defendant states that FSH has its own "grievance procedure in place to handle incidents such as allegedly occurred on January 19, 2007, and Plaintiff never availed himself of this process." Doc. 45-1, p. 4 (doc. 45, Ex. 1).

Defendant has presented the "offense event report" from the Chattahoochee Police Department for Friday, January 19, 2007. Doc. 45-1, pp. 8-9 (doc. 45, Ex. A). The report indicates that Officer Chason "was dispatched to New Forensic Unit 23 in reference to resident [versus] resident battery complaint." Doc. 45-1, p. 9 (doc. 45, Ex. A). It is reported that Plaintiff told the officer that while he was "sitting in the TV area, a Jovany Garcia approached him and asked who had changed the TV channel." *Id.* It is reported that Plaintiff answered "that staff changed the tv after other residents had agreed to watch the News." *Id.* Garcia then "became violent and struck [Plaintiff] in the left side of his nose causing a small abrasion." *Id.* Garcia then hit Plaintiff again in the

lower corner of his mouth, "causing minor damage to a tooth." *Id.* Plaintiff "fell to the floor and sustained a small cut on the knee." *Id.* Plaintiff was confined in a wheelchair and told the officer he did not fight back. *Id.* Officer Chason concluded that the "incident was handled correctly by Ward Staff and no further action is needed at this time." *Id.* The report is not signed by Officer Chason. *Id.* Plaintiff's injury was listed on the report as "minor." Doc. 45-1, p. 8 (doc. 45, Ex. A).

Plaintiff's complaint also made allegations about events which occurred on March 11, 2007, at the "mental retardation unit on the grounds of Florida State Hospital." Doc. 45-1, p. 4 (doc. 45, Ex. 1). Defendant notes that this unit is "run by the Agency for Persons with Disabilities which is a state agency separate and apart from the Department of Children and Families/Florida State Hospital." *Id.* "Plaintiff was housed in an entirely separate unit, at Florida State Hospital which shares no similarities in management, security or treatment with the 'mentally retarded unit.' " *Id.* Defendant points out in her affidavit that Plaintiff's only information about the alleged incident appears to come from a newspaper article and he has no personal knowledge of those events. *Id.*

Another incident, on May 16, 2007, did involve Plaintiff. On that day, Plaintiff and Leon Woolbright had an altercation and again the Police were called to the Hospital. *See* Doc. 45-1, pp. 4-5 (doc. 45, Ex. 1). Defendant states that she has no personal knowledge of this incident, and Plaintiff never contacted her as he alleges in the complaint. Doc. 45-1, pp. 4-5 (doc. 45, Ex. 1). Defendant also avers that she has no personal knowledge of Plaintiff's attempts to contact the police. *Id.*

The "offense event report" from the Chattahoochee Police Department has been presented for this incident as well. Doc. 45-1, pp. 10-11 (doc. 45, Ex. B). The report by Officer Mabardy notes that Officer Mabardy responded "to FSH Central Forensic Unit regarding a resident who" alleged that another resident had beaten him while on the ward. Doc. 45-1, p. 11 (doc. 45, Ex. B). Officer Mabardy arrived and was met by Lieutenant Brian McDowell, the Security Supervisor for FSH. *Id.* McDowell said that Hospital Security "had responded to ward B regarding a disturbance between two residents." *Id.* The incident was over at the time of Mabardy's arrival, but Plaintiff "was requesting to meet with law enforcement." *Id.*

Officer Mabardy reports that he met with Plaintiff, McDowell, and another ward staff member. Doc. 45-1, p. 11 (doc. 45, Ex. B). Plaintiff said that "at 4:05 pm while on ward 21B, he had rolled up to the dayroom area in his wheel chair to watch some television." *Id.* While Plaintiff was watching TV, another resident (a black male sitting two chairs down from Plaintiff) "began yelling and screaming at the television." *Id.* Plaintiff said that the resident's behavior upset him and Plaintiff told the other "resident to shut up because he was trying to watch the TV." *Id.* Plaintiff acknowledged that he called the other resident "the 'N' word." *Id.* Plaintiff said the "other resident immediately came up to him striking [him] with a closed fist across the top part of his left eye brow area." *Id.* Plaintiff reported the following events to Officer Mabardy:

> He [Plaintiff] stated that he began kicking at him to get him away. He stated that the resident then kick[ed] him in the area of his left kneecap causing injury. He stated that he was struck again with a closed fist to his left cheek causing injury to the cheek and possibly chipping a tooth. The other resident then grab[bed] the wheelchair and flipped him over backwards causing him to land on the floor striking the back of his head.

He state they (staff) finally arrived and got them separated before any
other damage could occur to him.

Doc. 45-1, p. 11 (doc. 45, Ex. B).  Physical examination of Plaintiff revealed a "small

abrasion to and just below the left kneecap area, some redness/puffiness to the left

eyebrow and left cheek areas."  *Id.*  Plaintiff "stated that he did not want to pursue any

charges but only wanted a report regarding the incident."  *Id.*  Officer Mabardy did not

sign the report.  *Id.*

Defendant avers in her affidavit that FSH "has a grievance procedure in place to

handle incidents such as allegedly occurred on May 16, 2007, and Plaintiff never

availed himself of this process, nor did an APS investigator ever notify [the Defendant]

regarding an allegation of abuse filed by Plaintiff concerning the alleged incident."  Doc.

45-1, p. 5 (doc. 45, Ex. 1).  Defendant states that she has no knowledge of Plaintiff's

having contacted her assistant, Melanie McClellan, of matters "he discussed with her

during his alleged 'lengthy phone conversation' with her."  *Id.*

Melanie McClellan also submitted a sworn declaration in response to Plaintiff's

complaint and in support of the Defendant's summary judgment motion.  Doc. 45-2

(Doc. 45, Ex. 2).  She is employed as an assistant to the Defendant, and as worked "as

assistant to the Hospital Administrator for over 26 years."  *Id.*  She denies that she told

Plaintiff that "prosecution rarely, if ever, occurs for patients who commit violence against

other patients or staff."  *Id.*  She does not deny that she had a telephone conversation

with Plaintiff on that date.  *Id.*

Defendant James avers that it is the official policy of FSH "to use 'best practice'

procedures when dealing with its residents, forensic or civil commitments, as those

professional standards and practices evolve over time." Doc. 45-1, p. 5 (doc. 45, Ex. 1). She states that her staff are "trained to respond to behaviors such as those alleged in the Complaint in the most therapeutically appropriate manner possible . . . ." Doc. 45-1, p. 6 (doc. 45, Ex. 1). Defendant contends that approach was in effect "on January 19, 2007, as reflected in the report by Officer Chason: 'This incident was handled correctly by Ward Staff and no further action is needed at this time.' " *Id.*, *citing* to Ex. A.

Defendant James has provided information within her declaration concerning the Resident Issue Resolution System. Doc. 45-1, p. 6 (doc. 45, Ex. 1). The Hospital has established procedures for the submission of either written or verbal grievances. Doc. 45-1, p. 6 (doc. 45, Ex. 1). There are no specified times to review a grievance and respond, but patients are provided written notice of a decision in resolving a grievance. *Id.* Defendant states that Plaintiff never used the grievance process concerning "either the incident on January 19, 2007, or the one on May 16, 2007, so as to afford the Hospital administration an opportunity to address the issues he now raises in this lawsuit." Doc. 45-1, p. 7 (doc. 45, Ex. 1).

**Plaintiff's evidence**

Plaintiff submitted an Information Report from FSH's Security Department dated May 16, 2007, which indicates Plaintiff made a "request to file charges resident v/s resident." Doc. 67-2, p. 6 (Plaintiff's Ex. B, doc. 67). The reports states that at 17:01 hours on May 16th, Officer Mabardy "arrived at Central Forensic Security Control Room and advised he was [there] to follow up on a 911 call made by resident Anderson, Geoffrey #064634." *Id.* Plaintiff was brought to the conference room and interviewed by Officer Mabardy. *Id.* Plaintiff said he had been attacked by resident Leon

Woolbright, hit with a closed fist, and also kicked. *Id.* Plaintiff "is confined to a Wheel Chair and stated he did try to defend himself as best he could until he fell out of his chair." *Id.* The report indicated digital photos were taken and would be "forwarded to CPD Officer Mabardy for his Probable Cause Affidavit." *Id.* Officer Mabardy advised that he would "probably not have his report finished" that evening but would advise the "Security Department when it [was] ready to pick up a copy." *Id.*

Plaintiff also submitted a photocopy of the "Resident Guide to Resolving Complaints." Doc. 67-4, p. 2 (doc. 67, Ex. D). That publication indicates that there are regular meetings for the "Ward Government" in which residents can come "and raise issues that are affecting the residents on your ward." Doc. 67-4, p. 3 (doc. 67, Ex. D). The Guide states that the "unit administration" will review and address the issues and, if unresolved, the resident's representative would "bring the issue to the Hospital Wide Ward Government Meeting for a response." *Id.* The publication also advises that residents can "call the Resident Advocacy Office and speak to Eileen Murray or her secretary, Karen Mayo, if" the resident feels that his question had not been answered within his unit. *Id.* The phone number is provided in the publication. *Id.* The Guide also advises a resident that he has "the right to file a grievance if he has been "unable to resolve" his issue or concern "through any of the previously mentioned channels." *Id.* The Guide states that resident complaint forms are available in the ward and indicates that the complaint would "discussed personally with" the resident. *Id.*

Plaintiff also provided Operating Procedure 75-1 for FSH. Doc. 67-5, p. 2 (doc. 67, Ex. E). The document advises that "all injuries regardless of severity" are to be reported. Doc. 67-5, p. 3 (doc. 67, Ex. E). All assaults are also to be reported, "even if

there is no injury." *Id.* The form notes that "[i]t is essential that when a resident

demonstrates assaultive/aggressive type behavior against another person (resident

and/or staff), a Resident Incident Report (Form 44, Attachment 1) must be completed."

*Id.* For a "resident-to-resident event, an incident report must be documented on

separate reports, one for each resident involved (aggressor and victim)." *Id.*

Plaintiff submitted his affidavit in opposition to summary judgment. Doc. 67-6

(doc. 67, Ex. F) (hereinafter cited only as "Plaintiff's affidavit" followed by a specific

paragraph number for the citation). Plaintiff avers that he arrived at FSH from the Leon

County Jail on January 8, 2007. Plaintiff's affidavit, ¶ 2. Plaintiff states that "within

days" he saw violent residents allowed to roam freely and threaten, attack, and injure

other residents. *Id.*, ¶ 3. Plaintiff states that he saw Jovany Garcia "verbally threaten

two different 'residents,' and he then smacked them in the face several times." *Id.*, at ¶

4.

Plaintiff avers that he saw another resident, Larry Meeks, "who constantly made

verbal threats to other 'residents,' and would pester 'residents' at lunch every day." *Id.*,

at ¶ 5. Plaintiff states that this individual "would threaten" residents to give him their

Kool-Aid. *Id.* Plaintiff states that Meeks threatened him "many times." *Id.* Plaintiff said

the ward staff were aware of this behavior "but would only <u>ask</u> Larry to refrain from his

aggressive behavior." *Id.* Plaintiff relates an incident where "Larry" also went "berserk,"

thinking FSH had stolen $20, and began throwing books, a trash can, and other items at

the station window of the nurses' station. *Id.*, at ¶ 6. Plaintiff states that Meeks was

"screaming obscenities during his entire tirade" before a security team arrived to subdue

him and give him a sedative. *Id.* Plaintiff reported that the next day, Larry was again

roaming the ward. *Id.* Plaintiff states that this happened twice. *Id.* Plaintiff said that staff told him Larry had been confined at FSH for over 30 years, and had been confined in an open ward, but had repeatedly attacked patients on the grounds of the hospital, was considered a threat to others, and now is housed in a "closed (locked-down) ward in forensics" due to his "known violent behavior . . . ." *Id.*, at ¶ 7.

Plaintiff states that after witnessing the threats and violence of "Larry Meeks, Jovany Garcia, and others, [he] complained to every staff member [he] met, stating that the hospital was a 'dangerous' place, and that [he] feared that [he] would be harmed, particularly since [he] was confined to a wheelchair." *Id.*, at ¶ 8. Plaintiff avers that he got telephone numbers for his four Service Team members, including Defendant Diane James, and "called them or their office and complained about the conditions of confinement at Florida States Hospital." *Id.*, at ¶ 9. Plaintiff avers that he complained to Dr. Raheb, the resident's attorney, and to his physical therapists. *Id.* Plaintiff asserts that all of his "complaints fell on deaf ears, as [he] was repeatedly told (by every person and office that [he] contacted) that this was a 'mental hospital,' that 'mentally ill' patients could become violent, that the staff and administration were well aware of the problems, but that it was an 'internal matter.' " *Id.*, at ¶ 10. Plaintiff avers he was told by all persons to whom he complained that it was the policy of FSH "was to 'minimize attention' to any problems, because the courts had determined all patients and 'residents' to be mentally ill, and therefore not responsible for their actions." *Id.*

Plaintiff avers that he was attacked by Jovany Garcia on January 19, 2007. *Id.*, ¶ 11. Plaintiff reports that Jovany Garcia attacked him and punched him "several times in the face, after a staff member had changed the channel on the day room television." *Id.*

Plaintiff says that from this assault he suffered "cuts and bruises, a chipped tooth, a bloody nose, and a black eye." *Id.* He says his "white t-shirt was covered in blood." *Id.* Plaintiff avers that he asked ward staff to call the police, but he was told not to call the police because "the attack was considered an 'internal matter.' " *Id.*, at ¶ 12. Plaintiff further testified that he was "never informed" of the grievance process available to residents. *Id.* Plaintiff decided to call the police anyway, and acknowledges that a police officer arrived, but wrote "<u>his</u> report, containing <u>his</u> version (interpretation) of the attack incident." *Id.* Plaintiff says he "wanted Garcia arrested." *Id.* Plaintiff states that later, he contacted "the same persons and offices to whom I had previously complained" and his "Service Team members, the Unit Director, and Diane James' office gave me the same explanations (excuses) that I had previously received." *Id.*, at ¶ 13. He avers that "several staff members chastised me for calling the police, and told me that 'official policy' was to handle all violent incidents as an 'internal matter.' " *Id.* Plaintiff states that Garcia later told him that he was a member of the Latin Kings gang in Miami, that he had been in jail for armed robbery, attempted murder, and other charges, that being a gangster was his sole ambition, and that the "hospital staff 'knew' how 'dangerous' he was, and how 'violent.' " *Id.*, at ¶ 14.

Plaintiff states that later, Garcia was found with a razor blade and ward staff conducted "an extensive search" for any other weapons. *Id.*, at ¶ 15. Garcia "went berserk, and was then confined to his room, using restraints." *Id.*

Plaintiff was moved from Ward 23-C to Ward 21-B, which he states is "another closed forensic unit at Florida State Hospital." *Id.*, at ¶ 16. According to Plaintiff, this unit, like Ward 23-C, has several residents "who actively made threats and engaged in

violence." *Id.* Plaintiff said that a resident named Adelsberger "regularly threatened violence against other 'residents,' including" Plaintiff. *Id.* Staff told Plaintiff that Adelsberger had been confined at FSH "for over 15 years, and was considered 'extremely dangerous.' " *Id.* Plaintiff states that Adelsberger was moved out of the ward after "several weeks, and many incidents of threatening behavior . . . ." *Id.*

Plaintiff reports that for one hour a day, residents from many of the other wards in the building were permitted to have recreation time and "mingled and interacted together." *Id.*, at ¶ 17. Plaintiff states that during these times, in the elevator to the recreation basement (open air but fenced) he was sometimes was "threatened by large, burly, forceful 'residents' " who Plaintiff reports would threaten to beat him with his wheelchair. *Id.* Plaintiff also states that during the recreation period, he heard various unnamed individuals suggest that their "incompetency [was] a game" and they would verbally threaten others. *Id.*, at ¶ 18.

Plaintiff states that he feared attacks, saw a poster on a wall near the nurse's station on ward 21-B and decided to contact "Adult Protective Services on February 28, 2007." *Id.*, at ¶ 19. A woman named Nikki Davis, who worked for the Florida Department of Children and Families, came to see him and gave Plaintiff a pamphlet. *Id.* Plaintiff told her of his what he had seen and experienced at FSH, and she "said she would notify her agency, the Adult Services Program, a subdivision of the Florida Department of Children and Families." *Id.*, at ¶ 20.

Plaintiff testified that on "May 16, 2007, Leon Woolbright attacked [him] and punched [him] several times in the face, kicked [him], and then flipped [him] over in [his] wheelchair." *Id.*, at ¶ 21. Plaintiff states that he suffered "cuts and bruises, a broken

tooth, and a head injury." *Id.* Plaintiff asked ward staff to call the police because he wanted to make a report and wanted Woolbright arrested. *Id.*, at ¶ 22. Plaintiff avers that staff told Plaintiff not to call the police because the incident was "an 'internal matter.' " *Id.* Plaintiff states again that staff did not inform him of any grievances process. *Id.* Plaintiff states that he called the police and an officer arrived, but similarly to the prior incident, the officer "later wrote <u>his</u> report, containing <u>his</u> version (interpretation) of the attack incident." *Id.*

Plaintiff states that he "insisted that Florida State Hospital Security Department document the incident (including photographs of [his] injuries, and [his] intention to press charges against the attacker)." *Id.*, at ¶ 23. After Plaintiff met with the police and the security team, he notified his new service team members, the operations manager, and Defendant "Diane James' office and notified them of the attack." *Id.*, at ¶ 24. Plaintiff reports being given the "same explanations (excuses) that [he] had previously received regarding the earlier attack by Jovany Garcia." *Id.*

Plaintiff avers that because of "the extreme violence that permeates the wards of Florida State Hospital, [he] had a constant fear that [he] would be murdered by a deranged 'resident.' " *Id.*, at ¶ 25. He states that FSH had no precautionary measures to protect residents from known and dangerous patients. *Id.* Plaintiff states that Leon Woolbright told him "that he had been to Florida State Hospital several times, and that the hospital 'knew' he was crazy and violent." *Id.*, at ¶ 26.

Plaintiff was released from FSH on June 28, 2007. Plaintiff's affidavit, ¶ 27. Plaintiff reports having contacted Melanie McClellan, the assistant to Florida State Hospital Administrator Diane James, on June 2, 2009. *Id.*, at ¶ 28. Plaintiff states that

at the end of their "lengthy phone conversation, Ms. McClellan stated to [him] 'prosecution rarely, if ever, occurs for patients who commit violence against other patients or staff.' " *Id.*

## Analysis

### Conspiracy claims, 42 U.S.C. §§ 1985 and 1986

Plaintiff brings claims of a conspiracy under 42 U.S.C. § 1985 and § 1986. Defendant asserts that Plaintiff fails to "allege a specific agreement or overt act committed in the course of the alleged conspiracy." Doc. 45, p. 12. Furthermore, because the § 1985 conspiracy claim is vague and conclusory and insufficient, Defendant argues the § 1986 derivative claim must also fail as well. *Id.*

Although Plaintiff fails to point to a specific provision under 42 U.S.C. § 1985 in bringing his claim, the statute has three subparts, only one of which is applicable. Section 1985 addresses (1) prevention of an officer from performing duties; (2) obstruction of justice; intimidating a party, witness, or juror; or (3) deprivation of rights or privileges. 42 U.S.C.A. § 1985. Plaintiff's claim must be premised upon § 1985(3), a deprivation of "equal protection" rights.[4] Under that provision, the conspiracy must be

---

[4] The third sub-part of § 1985 provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or

for the purpose of depriving a person of his "equal protection" rights and privileges and there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott, 463 U.S. 825, 828-29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), *quoted in* L.M.P. ex rel. E.P. v. School Bd. of Broward County, Fla., 516 F.Supp.2d 1305, 1315 (S.D. Fla. 2007). There are four elements for a cause of action brought under § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Burrell v. Board of Trustees of Ga. Military College 970 F.2d 785, 793-794 (11th Cir. 1992), *quoting* United Brotherhood of Carpenters & Joiners of America, 463 U.S. at 828-29, 103 S.Ct. 3352; *quoted in* L.M.P. ex rel. E.P., 516 F.Supp.2d at 1315.

Plaintiff's fifth amended complaint has no hint or suggestion of a racial or class-based animus. Even assuming *arguendo* that Plaintiff's complaint *could* be read to suggest a class-based discriminatory animus against mentally ill persons, Plaintiff's claim fails to present each of the elements necessary.

---

property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

The only assertion Plaintiff makes in the fifth amended complaint is that because the Florida State Hospital is a "primary employer in Chattahoochee, Florida and the surrounding area," the Hospital "controls the very politics and policies of local law enforcement, including the State Attorney's office." Doc. 23, p. 11. Plaintiff concludes that "local law enforcement denies Florida State Hospital inmates the right to due process in bringing charges against other inmates for inmate-on-inmate violence." *Id.* Plaintiff alleged that after both attacks from other residents at the Hospital, he "was informed that no action would be taken against the perpetrators of the violence to the Plaintiff." *Id.*, at 13, 14. Plaintiff claimed that the "refusal by hospital authorities (and law enforcement) to punish, restrict, or prosecute the perpetrators of each battery on the Plaintiff, created extreme mental anguish and emotional distress in the Plaintiff." *Id.*, at 13. Those statements fail to allege any racial or class animus or bias. The statements fail to allege any agreement, arrangement, or any meeting of the minds of any specific persons, much less present the basis for alleging a conspiracy by the named Defendant. There is no evidence that Defendant conspired with anyone.

Because Plaintiff has failed to present a claim for a conspiracy, the claim under § 1986 must fail as well because it is a derivative claim. *See* <u>Farese v. Scherer</u>, 342 F.3d 1223, 1232, n.12 (11th Cir. 2003), *citing* <u>Park v. City of Atlanta</u>, 120 F.3d 1157, 1159-60 (11th Cir.1997) (stating that "[t]he text of § 1986 requires the existence of a § 1985 conspiracy."). Where a § 1985 claim fails, the § 1986 claim must also fail. Summary judgment should be granted to Defendant on all of the conspiracy claims.

**§ 1983 claim**

Defendant contends that she has qualified immunity from an award of damages in her individual capacity.  Doc. 45, p. 13.  It is easier here to first determine whether Plaintiff has presented evidence supportive of his claim.  Pearson v. Callahan, 555 U.S. _, 129 S.Ct. 808, 821, 172 L.Ed.2d 565 (2009); Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Plaintiff's § 1983 claim for negligence is insufficient.  The Supreme Court has held that a state official's negligent conduct, even though it causes injury, does not constitute a deprivation under the Due Process Clause.  Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986).

The only potentially viable § 1983 claim is a Due Process claim. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) (citing Youngberg v. Romeo, 457 U.S. 307, 317, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982)).  Thus, as a matter of substantive due process, Plaintiff was entitled to "reasonable care and safety" because his liberty was restrained.  Youngberg v. Romeo, 457 U.S. at 324, 102 S.Ct. at 2462.  "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed – who may not be punished at all – in unsafe conditions."  457 U.S. at 315-316, 102 S.Ct. at 2458. The Court noted that while a person in custody for mental health care has a liberty interest in safety and freedom from bodily restraint, those interests are not absolute, and may conflict.  457 U.S. at 319-320, 102 S.Ct. at 2460.

In operating an institution such as Pennhurst, there are occasions in which it is necessary for the State to restrain the movement of residents – for example, to protect them as well as others from violence. Similar restraints may also be appropriate in a training program. And *an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement*.

457 U.S. at 320, 102 S.Ct. at 2460 (emphasis added, footnote omitted). In balancing

these interests, the Court said:

We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. *It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made*." 644 F.2d, at 178.[5] Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. *Cf.* Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). At the same time, this standard is lower than the "compelling" or "substantial" necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety. We think this requirement would place an undue burden on the administration of institutions such as Pennhurst and also *would restrict unnecessarily the exercise of professional judgment as to the needs of residents*.

457 U.S. at 322-323, 102 S.Ct. at 2461-2462.

This standard is similar to the standard for the duty to protect pretrial detainees.

Conditions of confinement imposed upon pretrial detainees before conviction in a jail

setting are limited by the Due Process clause of the Fourteenth Amendment. Hamm v.

DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096

(1986) (citing Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447

---

[5] Romeo v. Youngberg, 644 F.2d 147 (3rd Cir. 1980) (the case decided below).

(1979)). Due process "guarantees pretrial detainees the right to the basic necessities

that the Eighth Amendment guarantees convicted persons," and a "prison official may

be held liable for failing to prevent harm to a prisoner if he is deliberately indifferent to

the prisoner's health or safety." Gish v. Thomas, 516 F.3d 952, 954 (11th Cir. 2008)

(citing, among other cases, Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970,

1977, 128 L.Ed.2d 811 (1994)). Thus, Eighth Amendment law has been used as the

Due Process standard.[6] Application of the due process standard to a pretrial detainee

requires considerable deference to the administrator: "[T]he courts should not attempt

to make 'judgment calls' to determine which of various marginally different conditions

might be more appropriate." Hamm, 774 F.2d at 1573.

Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), is

the most important case for a failure to protect claim in a prison setting applying the

Eighth Amendment. Farmer v. Brennan held that:

> . . . a prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of confinement
> unless the official knows of and disregards an excessive risk to inmate
> health or safety; the official must both be aware of facts from which the
> inference could be drawn that a substantial risk of serious harm exists,
> and he must also draw the inference.

511 U.S. at 837; 114 S.Ct. at 1979. Farmer further held that "an Eighth Amendment

claimant need not show that a prison official acted or failed to act believing that harm

actually would befall an inmate; it is enough that the official acted or failed to act

despite his knowledge of a substantial risk of harm." 511 U.S. at 842; 114 S.Ct. at

---

[6] The Eleventh Circuit has not decided *en banc* whether the Due Process
standard is the same as the Eighth Amendment standard. Marsh v. Butler County, Ala.,
268 F.3d 1014, 1024 n.5 (11th Cir. 2001). This court must follow the panel decision in
Gish.

1981.  _Farmer_ explained that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  _Id._  The Court implied, however, that officials may avoid liability by showing "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  511 U.S. at 114 S.Ct. at 1982.  But in this regard, the Court cautioned that an official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . ."  _Id._, n. 8.  The Court said:

> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.  The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

511 U.S. at 843, 114 S.Ct. at 1982 (citation omitted).  Finally, the Court pointed out that "prison officials who actually knew of a substantial risk to inmate health or safety may be free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  511 U.S. at 844; 114 S.Ct. at 1982-1983.

All of these cases provide guidance for the proper standard here.  Indeed, since Plaintiff was confined pending a criminal proceeding, he was, in effect, a pretrial

detainee temporarily in the custody of the Hospital for mental health evaluation and treatment.

Since several of the matters set forth in Plaintiff's affidavit are either not addressed by Defendant's evidence, or are contradicted, it will be assumed that Plaintiff's evidence is true. Plaintiff has established that he was at risk of assault while he was in Defendant's custody. He was twice assaulted, he observed a number of patients threatening and bullying other patients, and he himself was subjected to that bullying. Plaintiff has established that some of the patients with whom he was housed were mentally ill and dangerous to others.

Plaintiff has also established that he repeatedly complained to everyone in charge and under Defendant's supervision, including Defendant herself, about the risk of patient on patient violence. Plaintiff has not, however, presented evidence that Defendant was made aware of imminent risk prior to the occurrence of the two assaults, or that she personally could have taken some specific action on Plaintiff's behalf to prevent those two particular assaults. Defendant can hardly be found personally liable for failing to protect Plaintiff from assault in the second incident when Plaintiff used an exceptionally offensive racial epithet when speaking to his assailant.[7] Thus, to the extent that Plaintiff's claim is founded upon Defendant's personal knowledge of an imminent risk to Plaintiff with respect to the two assaults, the claim fails.

Plaintiff's claim also proceeds upon the theory that it was Defendant's policy, generally implemented, to be deliberately indifferent to a general risk to Plaintiff's safety

---

[7] Even if Woolbright had used racial epithets against Plaintiff, as Plaintiff asserts, doc. 67, p. 5, Plaintiff improperly invited an escalation of the encounter by use of an offensive name in response.

and, that as a consequence, he was assaulted twice. Plaintiff has established that it

was Defendant's policy that patient on patient assaults would not be criminally

prosecuted, and this is a central portion of his proof, but that evidence does not support

the claim. Giving deference to the Hospital administrators, as the court must do, it is not

irrational to elect not to prosecute patients who are committed to FSH because they are

incompetent to participate in criminal proceedings or may have lacked criminal

responsibility for their offenses due to mental illness. Such prosecutions would probably

result in return of the patients to the Hospital for further evaluation. Thus, criminal

prosecution would not alleviate the risk by removing the violent patient from the

Hospital.

This leaves for consideration whether the evidence is sufficient to show that it

was Defendant's policy to fail to implement general procedures to provide reasonable

protection to Plaintiff. Again, it is assumed that Defendant knew of Plaintiff's complaints

about risk of harm from some aggressive and potentially violent patients. Other than

that evidence, Plaintiff has come forward with no evidence to support this sort of claim.

Plaintiff has not proved the risk. Plaintiff has come forward with no evidence to describe

the spaces in which he was housed, the numbers of patients with whom he was

housed, the percentage of such patients who in fact bullied other patients or assaulted

them, the frequency of such assaults, the level of staffing provided in those housing

areas to protect patients, and the nature of the responses by staff to any such assaults.[8]


Plaintiff has also come forward with no evidence to describe what should have been done to provide greater protection, given the risk.  The only evidence presented is favorable to Defendant.  Defendant has a procedure whereby a patient may present a request for protection.  Defendant's response when a violent incident occurs is to separate the offending patient from the housing unit and provide medication until the offending patient calms down.  There is no evidence that Defendant interfered with the two police investigations that occurred.  These policies are reasonable responses to the problem of patient on patient aggression and violence.  Plaintiff has not shown that Defendant's policies in general could have been changed so as to provide greater safety to him and still serve the treatment purposes of the hospital.

Accordingly, it is **RECOMMENDED** that Defendant's first motion for summary judgment, doc. 45, be **GRANTED** and judgment be entered in Defendant's favor.

**IN CHAMBERS** at Tallahassee, Florida, on August 5, 2010.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[8] Defendant's evidence that her staff follows "best practices" provides no evidence as to what practices are encompassed within that phrase or why they are "best."  That Officer Chason thought that the first incident was appropriately handled does not help either.  Officer Chason has no expertise in treating and protecting the mentally ill.  Defendant could have provided a lot more evidence about what Defendant actually does to protect patients from one another at FSH.  Still, it is Plaintiff's burden, not Defendant's, to come forward with evidence that whatever practices were followed were not professionally reasonable in the setting at FSH.

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.